No. 2156

Second Circuit Appeal.

---

TRAVIS H. BEDSOLE v. HILL, HARRIS & COMPANY, INC.

---

(June 13, 1925, Opinion and Decree)

---

(*Syllabus by the Editor.*)

1. Louisiana  D i g e s t — Negligence—Par. 1, 2.

Where the employees of defendant waved the driver of a mule team to pass a spot, near where a tree was being sawed, and this tree fell upon a mule of the team killing him, it was gross negligence of the employees, giving plaintiff owner of the mule the right to recover damages.

(Civil Code, Art. 2315. Editor's note.)

2. Louisiana Digest—Timber—Par. 9, 14, 15.

Where defendant manufactured timber wrongfully cut from another's land into lumber, and, having received the price of the lumber, the defendant cannot be relieved from paying plaintiff for cutting and hauling the logs from which the lumber was made. Nor can defendant claim damages for wrongful cutting of timbers where it was done by plaintiff in good faith.

Appeal from Thirteenth Judicial District Court of Louisiana, Parish of Rapides. Hon. L. L. Hooe, Judge.

This is a suit to recover the value of a mule killed and also for a balance due.

There was a reconventional demand. There was judgment for plaintiff and defendant appealed. Judgment amended and affirmed.

Peterman, Dear & Peterman, of Alexandria, attorneys for plaintiff, appellee.

Overton & Hill, of Alexandria, attorneys for defendant, appellant.

REYNOLDS, J. This is a suit by Travis H. Bedsole against Hill, Harris & Co., Inc., to recover $185.00, being the value of a mule killed that belonged to plaintiff. The mule was killed by the falling of a tree sawed by defendant's employees. Plaintiff also sues for the further sum of $238.00, claimed as a balance due for hauling timber to defendant's mill at $10.00 per thousand feet under a contract providing that defendant might retain 50 cents per thousand feet of the contract price for the hauling to guarantee performance of plaintiff's logging contract.

Defendant denied liability for the killing of the mule on the ground that its employees were without fault and that plaintiff's contributory negligence was responsible for the accident. And it denied liability for the 50 cents per thousand feet of timber hauled reserved on the ground that plaintiff violated his contract by hauling and delivering to defendant 56,915 feet of logs from the land of J. W. Peak on Section 16. And defendant claimed judgment in reconvention against plaintiff for the sum of $569.50 damages therefor and for $20.00 for a check given by defendant to plaintiff that was not paid for lack of funds in the bank on which it was given.

On these issues the case went to trial and there was judgment in favor of plaintiff for $393.05.

Defendant appealed, and plaintiff answered the appeal, praying that the judgment be amended so as to allow him judgment for $423.00.

## OPINION

The first question is as to the liability for the mule. The value of the mule is admitted to be $183.00. (Evidence, p. 11.)

The mule was killed by a tree that defendant's employees sawed and which fell across the road and on the mule, killing him.

As to the conditions concerning the killing of the mule, the evidence showed:

J. W. Dorsey testified, page 6:

"Q. Where were you at the time the mule was killed?
"A. I was on my team, about thirty or forty steps ahead of the teams, to the best of my knowledge.

Page 7

"Q. Before you got to the tree, what did you do?
"A. I stopped. We had a hill to pull there and I stopped. I was on the level, and I seen him cutting the tree and I asked him if there was any danger, and he said 'no.'
          *  *  *  *
"Q. What did you ask him?
"A. If there was any danger, and he said 'no,' and he flagged me on by.
          *  *  *  *
"Q. And you drove by?
"A. Yes, sir.
"Q. How far was Snead's team behind you?
"A. Right behind me. I started on a little ahead of him, but he had come on up the hill and was right behind me.
          *  *  *  *
"Q. Did you see him giving any signal to Snead to stop?
"A. No, sir.

Page 10

"Q. Did you say anything to this man Moffett?
"A. Yes, sir; I asked him what in the world he meant by not stopping the team, and Moffett said he did not know that the tree was as near down as it was. It was cut plumb off and nothing to prevent it going any way it wanted to go."

L. E. Dorsey testified, page 20:

"Q. What did he do after he stopped?
"A. Asked Mr. Moffett if there was any danger in the tree and Mr. Moffett

said, 'No, there wasn't any danger, and to come on by,' and flagged him to come on by."

Jack Bedsole, page 24:

"Q. Did you see the man at the tree do anything?

"A. Saw him wave his hand like that, telling him to go ahead; that is all I seen."

(Witness demonstrates to the court.)

### Page 25

"Q. How far was Snead's team behind Dorsey's?

"A. When Dorsey started up, I would say about thirty (30) steps, to the best of my knowledge.

* * * *

"Q. And when Snead got there, the tree fell over?

"A. Yes, sir.

"Q. What did Snead do, if anything?

"A. Pulled his team out to the left and jumped off his saddle mule. If he hadn't of done that it would have killed the saddle mule, too; it knocked her down and I got the harness and rolled the log back off the saddle mule so that she could get up.

### Page 26

"Q. What did you say Moffett done?

"A. Waved him by.

"Q. Did you see him when he waved?

"A. Yes, sir.

O. M. Moffett testified, page 49:

"Q. How many teams came up on that occasion that you all were sawing on that tree?

"A. There were three teams in all.

"Q. They passed by that tree?

"A. The head team passed; there were two teams that didn't pass right then.

"Q. How far had you all gone with the work of sawing down that tree at the time that the head team came along?

"A. We had the tree, I reckon, half-way down, or better than half-way down when the first team came by—over half-way down.

### Page 50

"Q. Did the 'Dorsey' team stop before it reached the tree?

"A. Yes, sir, he just stopped long enough to ask if he could pass.

* * * *

"Q. What did Mr. Hatfield say to him?

"A. He told him to come on by and he quit work and he went on by.

"Q. Did you all work while he was passing by?

"A. No, sir.

* * * *

"Q. At the time that Dorsey's team passed by, was the tree safe from falling?

"A. Yes, sir.

"Q. At the time that Dorsey's team passed by, how near was the next team?

"A. Something about fifty (50) yards back behind, had just come up on top of the hill.

### Page 51

"Q. What did you do after Dorsey's team had passed on by?

"A. We sawed just a little and Hatfield said to me (interrupted).

"Q. You resumed sawing and sawed a little?

"A. Yes, sir.

"Q. Please state why you sawed a little more?

"A. So that the tree would fall.

"Q. Then, after you all sawed a little, what did you all do?

"A. Wedged the tree—the other man wedged the tree.

"Q. Who did the wedging?

"A. Mr. Hatfield.

### Page 52

"Q. Well, now, before this second team, the 'Snead' team, came up, did Mr. Hatfield say anything?

"A. Yes, sir, said: 'Wait until the tree falls. I can't tell which way it is going.'

"Q. Did he say anything else?

"A. No, sir.

"Q. To whom did he say that to?

"A. To one of Mr. Bedsole's drivers, the one whom the mule got killed.

"Q. It was the driver of the second team?

"A. Yes, sir.

"Q. About how far was the driver of the second team from you all when Hatfield told him to wait?

"A. Something like forty (40) or fifty (50) yards, something like that.

* * * *

"Q. How did he tell him, did he talk in a low voice or holler it out to him?

"A. He just spoke it out, didn't holler it out and didn't talk in a low voice.

### Page 53

"Q. After he told him to wait, that he was putting the wedge in, or whatever he told him, what did you and Hatfield then do?

"A. Hatfield went to working with his wedges.

"Q. What were you doing?

"A. Standing there holding the saw.

"Q. Did you watch the team any further after that?

"A. No, sir.

"Q. Did Mr. Hatfield?

"A. No, he had his back to them.

"Q. Did you all continue to work from then on until the tree fell, or did you stop working?

"A. Worked right on until the tree fell.

"Q. On which side of the tree did you have the wedges, on the road side, or— (interrupted).

"A. On the road side.

"Q. Which way were you trying to make the tree fall?

"A. Out from the road.

### Page 55

"Q. Did Mr. Hatfield have his face towards this second team or was his back towards it?

"A. His back was towards it.

*    *    *    *

"Q. Then you didn't notice the team after Hatfield hollered to the driver up until the time that the tree was falling?

"A. No, sir.

"Q. As I understand, you were busy with your work?

"A. Yes, sir.

"Q. Was Hatfield busy, too?

"A. Yes, sir.

### Page 58

"Q. That tree was sawed clean off without any splinter being left?.

"A. Yes, sir.

"Q. You say you had sawed it a little better than half-way through when Dorsey called to you?

"A. Yes, sir, probably a little more.

"Q. Now you started to sawing again when Dorsey got by?

"A. Yes, sir.

"Q. You stopped when Dorsey called to you until he passed by?

"A. Yes, sir.

"Q. And the other team was coming on behind?

"A. Yes, sir, and we told him to wait until the tree fell.

"Q. You all went to sawing again?

"A. Yes, sir.

"Q. So when Snead's team started coming towards the tree when you all went to work, you were not driving wedges?

"A. Yes, sir, I just hit a lick or two with the saw and then stopped and went to driving wedges.

"Q. You said you had sawed it a little over half-way through, you all had to finish sawing it?

"A. I said I may have sawed it a little over half-way through.

"Q. Did it break off or did you finish sawing it off?

"A. We finished sawing it off.

*    *    *    *

"Q. Dorsey passed you?

"A. Yes, sir.

"Q. And you went back to work?

"A. Yes, sir.

"Q. To sawing?

"A. Yes, sir, but very little bit.

"Q. And Snead was coming up with his team?

"A. Yes, sir.

### Page 60

"Q. You say Hatfield said—what did Hatfield say to Snead?

"A. Said: 'Don't drive under this tree until it falls, I can't tell which way it is going.'

"Q. And Snead kept on going anyway?

"A. He told him that and then went to driving his wedges, and then turned around with his back to him.

"Q. Snead was then something like forty (40) or fifty (50) steps away?

"A. Something like that—may have been closer.

"Q. And then Snead kept on coming after Hatfield had told him not to drive up there?

"A. Yes, sir—now he might not have heard him.

### Page 61

"Q. He could hear what Hatfield said?

"A. I don't . know whether he could or not for the harness was rattling on the teams.

"Q. Didn't the harness, etc., rattle on Snead's teams also?

"A. Yes, sir, but the last wagon was farther back. I don't know whether Snead heard him or not.

"Q. What was he, Hatfield, doing at the time that he hollered to Snead?

"A. Fixing to go to driving wedges.

"Q. And Snead kept on coming?

"A. I suppose he did—I had my back to him—I don't know.

### Page 63

"Q. Why did you all cut that one all the way through?

"A. Well, my corner was laying a little bit and he told me to cut my corner off a little, and his was nearer cut off than I thought it was, and there wasn't anything to hold the tree.

"Q. So Hatfield was the one that was responsible for that tree being cut all the way through?

"A. He had it cut more than he thought it was.

"Q. You couldn't see that?

"A. No, sir.

"Q. Wasn't the saw almost through the tree before you quit sawing?

"A. Yes, sir, but the men on the opposite side can't tell anything about that.

"Q. So it was Hatfield's mistake and not yours?

"A. Well, he was boss of the saw and I was supposed to do what he told me to.

"Q. It was Hatfield that made you cut on through the tree?

"A. He told me to cut my corner there —he was the one that made the mistake.

### Page 64

"Q. Did you tell Mr. Bedsole here and in the presence of Mr. Dorsey that you were to blame for that accident?

"A. If I did I don't remember it. I told Bedsole that night that if the mule had to be paid for that I was willing to let whatever I had in the office at that time go for the mule. I didn't feel in any way responsible, but was willing to do that.

"Q. You felt that Hatfield was responsible for the mule getting killed, but were willing for Mr. Bedsole to take all you had in the office at that time to pay for the mule?

"A. If Mr. Hatfield, my partner, was willing to do it."

From this evidence it appears that defendant's employees, who were sawing a tree by the side of the road, gave the drivers of plaintiff's train of three or four teams assurance that it was safe for them to pass and waved them to drive by.

This assurance of safety and waving of the hand to the driver of the first team to pass by was, we think, fairly interpreted by the driver of the second team to include himself; for, under the testimony, the first team had been stopped, and the second team was moving and was only from thirty to fifty steps behind the first team and never came to a halt; and under the moral of the tortoise and the hare, the second team must have been quite close to the first at the time the tree fell. After waving the first team by and before the second team had time to pass, the defendant's employees began sawing on the tree that they knew was likely to fall and that did fall across the road and kill plaintiff's mule.

This, we think, was gross negligence.

Defendant's witness, Moffett, insists that his co-worker, Hatfield, told the driver of the second team to stop, but he says, on page 60:

"Q. And then Snead kept on coming after Hatfield told him not to drive up there?

"A. Yes, sir—now, he might not have heard him.

And Tom Snead, driver of the second team, testified, in answer to interrogatory five:

"Question. If you state that you were present at this accident, please state what

you saw and heard, and give in detail what you know of your own knowledge concerning this accident?

"Answer. Three of Mr. Bedsole's teams were going to the camp with a load of logs. John Dorsey was driving the front team. I was driving the second and Jack Bedsole was driving the third. We were coming along the road and two men were sawing a tree near the road. Dorsey, who was in front of me, stopped his team and hollered if it was all right to come on. One of the men at the tree, don't know name, yelled to come on and waved his hand for us to drive on. Dorsey drove on by and I was following with my team and when I got opposite the tree it started to fall and Moffett jumped out and hollered, but it was too late and the tree fell on the mule and killed it. I asked the man why he didn't let me know the tree was about to fall and he said he didn't know it was cut so far through. That's about all I know."

J. W. Dorsey testified, page 8:

"Q. How far was Snead's team behind you?

"A. Right behind me; I started on a little ahead of him, but he had come on up the hill, and was right behind me.

### Page 45

"Q. You didn't hear whether they spoke to the other teamsters and didn't hear what they said?

"A. If they spoke anything to the other teams I didn't hear it."

We are convinced from this evidence that defendant's employees, without due and sufficient notice to the second team not to approach, sawed off the tree that fell across the road and killed plaintiff's mule, and that the judgment of the District Court as to defendant's liability on this item of plaintiff's demand is correct.

Plaintiff's second demand is for fifty cents per thousand feet for the logs hauled and delivered by him to defendant's mill, under a contract by which defendant was to pay plaintiff $10.00 per thousand feet for the hauling and was to retain fifty cents per thousand feet as a guarantee

that plaintiff would fulfill his contract

It is not claimed that plaintiff failed to complete his contract. The evidence shows that he did complete his contract and defendant is claiming damages against him on the ground that he had more than completed it by hauling 59,910 feet of timber from Section 16.

As to the timber cut and hauled and delivered to defendant by plaintiff from Section 16, the evidence convinces us that the plaintiff cut and hauled same, believing it belonged to defendant.

He testified, page 67:

"Q. Do you know that it was not the Hill, Harris & Company land?

"A. No, I thought it was.

### Page 68

"Q. Did he not tell you in that conversation not to undertake to cut any timber until the lines had been run and blased?

"A. He told me to cut this timber here and put it on the skidways, that this was the best timber they had and they wanted it on the skidways.

"Q. You are referring to the Peak timber?

"A. That was the timber that later on Mr. Sasser put up the lines and showed that it was Peak's timber.

"Q. You say that Mr. Hill told you to go ahead and cut the Peak timber?

"A. He didn't say 'the Peak timber,' but said: 'Go ahead and cut this pine timber and put it on the skid, as it was the best timber that Hill-Harris had.' It was the timber that proved out afterwards to be the Peak timber.

"Q. You deny that he told you not to cut that timber until the lines had been run?

"A. He never did tell me not to cut it.

"Q. Did he tell you anything about Mr. Sasser going to run the lines?

"A. He told me something about going to hire Mr. Sasser or something, but I don't remember what it was for."

J. J. Sasser testified, page 109:

"Q. Did you hear any conversation between Bedsole and Hill relative to cutting the timber on the Peak property?

"A. I heard a conversation between Mr. Bedsole and Mr. Hill in regard to cutting the timber in that neighborhood. We were then on, or right on, the line ·of the property when the conversation passed.

"Q. State what the conversation was?
"A. Mr. Hill and myself and the party I just named went down there and looked at the timber on the Peak property and on Section eleven (11), which was adjoining Peak's property, and as we were coming back to the car that we went in, which was Mr. Hill's car, we met Mr. Bedsole, and we sat down and were resting and talking, and the question was asked by John Hill: 'How much timber do you think there is in here,' and I answered the question: 'There is about four hundred thousand'; Mr. Bedsole says: 'If I knew there was four hundred thousand, there is a truck done bought to truck it out,' and then I says: 'It is here'; Hill says to Bedsole: 'Cut it down and put it on the ramp, this is the kind of timber we need.' Mr. Hill didn't say on which side of the line, whether this or that side, and we were sitting right close to the line on sixteen (16) and seventeen (17).

"Q. Did you hear Bedsole say anything about putting his saw in there in the morning?
,   "A. He said he would put his saw in there as quick as the ground would pack the timber out; the ground had just been under water, and Mr. Hill said that a man could haul it out by hauling light loads."

The evidence shows that defendant knew within ten days of the cutting that this timber on Section 16 had been cut, and for more than two months thereafter it continued to receive the logs cut and hauled by plaintiff to it, and it settled with plaintiff for same every two weeks.

Defendant manufactured timber cut and delivered to him by plaintiff from Section 16 into lumber and sold the lumber after it discovered that the timber came off of Section 16, and having received the price of the lumber it cannot be relieved from paying plaintiff for cutting and hauling the logs from which the lumber was manufactured.

Cloud vs. Warner, 157 La. 14, 101 South 794.

The contract under which plaintiff claims being a completed contract, and defendant admittedly having retained under the contract fifty cents per thousand feet of the contract price for cutting and hauling the timber, or $238.00, defendant owes plaintiff this amount.

Ruling Case Law, volume 6, page 990 says:

"The strict performance of a contract may be waived. A person for whose benefit anything is to be done may, if he pleases, dispense with any part of it or circumstances in the mode of performance. Where he is present receiving performance, whatever is not executed is considered as waived, for if objection had been made on the ground of those matters in which the proposed performance was deficient this might have been supplied at the time, and therefore it is not proper to surprise the party who performed the act by an objection to the mode of performance after his vigilance has been disarmed by an apparent acquiescence, for that could be a fraud."

In the same volume, page 993, the following rule is announced:

"If a contract to furnish movable articles arises after work be done on such articles, the use or retention thereof without giving notice of any objection, is generally treated as an acceptance.

* * * *

"It is necessary to the proper protection of the vendor that the vendee, if he rejects the goods and thereby throws them back upon the vendor should act with reasonable promptness. It would be unjust to permit him to return the goods after inspection and subsequently claim that they were not according to contract. He is bound to express his dissent and thus· enable the vendor to protect his interest."

We have found no evidence in the record as to defendant's demand for $20 for a check alleged to have been given it by plaintiff and not paid for lack of funds in the bank on which it was withdrawn to plaintiff's credit. This demand of defendant must therefore be dismissed as in case of non suit.

For these reasons the judgment of the lower court is affirmed in part and amended in part.

And it is now ordered, adjudged and decreed that the plaintiff, Travis H. Bedsole, do have and recover judgment against Hill-Harris & Co., Inc., for the full sum of $423.00 with 5 per cent per annum interest thereon from the date of this judgment.

It is further ordered, adjudged and decreed that defendant's reconventional demand for $569.15 be rejected, and that defendant's reconventional demand for $20.00 for the unpaid check be dismissed as in case of non suit.

It is further ordered that defendant pay the costs of both courts.